| | | |
|---|---|---|
| MARY STUART ROGERS, TRUSTEE OF THE MARION KNOTT MCINTYRE REVOCABLE TRUST AND PERSONAL REPRESENTATIVE OF THE ESTATE OF MARION KNOTT MCINTYRE 125 Charlesbrooke Road Baltimore, Maryland 21212 | * * * * * | IN THE CIRCUIT COURT FOR BALTIMORE COUNTY CASE NO.:_____ |
| Plaintiff | * | |
| v. | * | |
| REVEREND FATHER CHRISTOPHER SENK 554 Bluebell Road Venice, Florida 34293 | * * * | |
| Defendant | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT

Mary Stuart Rogers, in her capacities as the Trustee of the Marion Knott McIntyre Revocable Trust and as the Personal Representative of the Estate of Marion Knott McIntyre, plaintiff, by her counsel and pursuant to the Maryland Rules, sues Reverend Father Christopher Senk ("Fr. Senk"), the defendant, and alleges as follows:

## A.   NATURE OF THE ACTION

1.     Fr. Senk intentionally took economic advantage of an elderly and vulnerable adult, Mrs. Marion Knott McIntyre ("Mrs. McIntyre"), to the detriment of the Marion Knott McIntyre Revocable Trust (the "Trust"), Mrs. McIntyre herself, and the residual beneficiary of the Trust, University of Notre Dame du Lac ("Notre Dame"). From 2009 to 2015, Mrs. McIntyre suffered from various physical ailments and rapid mental deterioration. During this period, Fr. Senk inappropriately and unduly influenced Mrs. McIntyre to revise her Trust for Fr. Senk's benefit.

Fr. Senk further unduly influenced Mrs. McIntyre to convey significant Trust assets, other assets, and personal possessions to Fr. Senk. As a result of Fr. Senk's actions, Mrs. McIntyre, herself, the Trust, and the Trust's beneficiary, Notre Dame, which was a primary Trust beneficiary prior to the unduly influenced Trust revisions, have been damaged economically. The Trust, by and through its Trustee, and the Estate of Mrs. McIntyre, by and through its Personal Representative, brings this action to obtain relief from the inappropriate actions of Fr. Senk.

**B.     THE PARTIES**

2.     Mrs. McIntye is the settlor and was the life beneficiary of the Trust at issue. She died in Baltimore, Maryland on December 12, 2017.

3.     The Trust is a trust established by the Revocable Trust Agreement dated December 5, 2000, amended by the First Amendment to and First Restatement dated June 7, 2001, amended by the Second Amendment and Restatement dated July 21, 2011, amended by the First Amendment of Restatement of Trust dated July 9, 2012, and further amended by the First Amendment to Restatement of Trust dated August 15, 2012 (collectively, the "Trust").

4.     The Trust assets currently are in the custody of Northern Trust Company, which has various locations along the East Coast.

5.     Mary Stuart Rodgers (the "Trustee and Personal Representative") is an individual living in and administering the Trust in Baltimore County, Maryland. She also serves as the Personal Representative of Ms. McIntyre's Estate (the "Estate") under the terms of Ms. McIntyre's Last Will & Testament dated July 21, 2011. The Trustee and Personal Representative is a niece of Mrs. McIntyre.

6.     Defendant, The Reverend Father Senk, is a Catholic priest. Fr. Senk is believed to reside in the State of Florida at a property he owns, which is known as 554 Bluebell Road,

2

Venice, Florida 34293.[1]

7.      The sole residual beneficiary, University of Notre Dame du Lac ("Notre Dame") is an Indiana corporation with its principal place of business located at 203 Main Building, Notre Dame, Indiana.

C.      **JURISDICTION AND VENUE**

8.      This Court has personal jurisdiction in this action.  Specifically, the State of Maryland has jurisdiction over this matter pursuant to Maryland Code Annotated, Estates and Trusts Article[2], §14.5-202 (2018).  The Trustee and Personal Representative resides in and administers the Trust in Baltimore County, Maryland.  As the principal administration of the Trust is in Baltimore County, Maryland, the Trustee and Personal Representative has submitted personally to the jurisdiction of Maryland courts.  Furthermore, pursuant to E&T §14.5-202(b), with respect to the interests of a beneficiary of a trust that has a principal place of administration in Maryland, the beneficiary is subject to the jurisdiction of the courts in Maryland regarding a matter involving the Trust.  Fr. Senk is a beneficiary of the Trust.  Therefore, the Trustee and Personal Representative and Fr. Senk, each, are subject to the personal jurisdiction in Maryland regarding a matter involving the Trust.

9.      Venue is proper in this Court because Defendant Fr. Senk is subject to the personal jurisdiction of this Court with respect to this action, and the Trust is being administered

---

[1] Although the exact whereabouts of Fr. Senk remain unknown, he has retained and, upon information and belief, regularly communicates with his legal counsel in Baltimore County, Maryland.  Fr. Senk also appeared through counsel in this Court in 2017 in a related proceeding that he initiated known as *Father Christopher Senk v. Mary Lindsay Riehl Gallagher*, Case No. C-17-4200.

[2] Selected provisions of the Maryland Code Annotated, Estates & Trusts Article (2018), will be referred to hereinafter simply as "E&T."

in Baltimore County, Maryland.

10.     By virtue of this Court's statutory equity powers, this Court may take any action and exercise jurisdiction as may be necessary in the interests of justice.  E&T §14.5-105(14).

11.     Furthermore, a court in the State of Maryland has statutory authority to intervene actively in the administration of the Trust, fashioning and implementing remedies as the public interest and the interests of the beneficiaries may require.  E&T §14.5-201.

D.     **FACTUAL BACKGROUND**

12.     Mrs. McIntyre is the daughter of Marion Burke Knott (deceased) and Henry J. Knott (deceased) (collectively, the "Knotts"), formerly of Baltimore County, Maryland.

13.     During their lifetime, the Knotts made significant philanthropic contributions to various medical and educational institutions in Baltimore and beyond.

14.     Mrs. McIntyre was a deeply religious individual, having spent time in a religious order as a nun.  She was a devoted Roman Catholic.

15.     Mrs. McIntyre continued her parents' tradition of generosity by engaging in similar philanthropic activities, which focused particularly on Catholic educational and medical institutions.

16.     Throughout her life, Mrs. McIntyre demonstrated a sincere and deep affection for Notre Dame.

17.     Mrs. McIntyre received a M.A. from Notre Dame in 1968.

18.     Mrs. McIntyre lived and worked at Notre Dame for approximately 20 years.

19.     Mrs. McIntyre served on the Advisory Council for the University of Notre Dame's Snite Museum of Art for almost three decades.

20.     Mrs. McIntyre made various financial contributions to Notre Dame throughout her lifetime.

4

21.     In 1983, Mrs. McIntyre's personal writings stipulated that funds in her estate be left to Notre Dame to be used to create a memorial for her mother and father.

22.     In or about 1989, Mrs. McIntyre married Richard A. McIntyre.

23.     On December 5, 2000, Mrs. McIntyre created and executed the Marion Knott McIntyre Trust (the "2000 Trust"). The 2000 Trust, and all subsequent versions of the Trust, provide income to Mrs. McIntyre for life. Upon Mrs. McIntyre's death, the 2000 Trust provides income to Mr. McIntyre for life. Upon Mr. McIntyre's death, or if he does not survive Mrs. McIntyre, the entire residuary will be split, with one-half left to a nephew and the other one-half left to Notre Dame's Snite Museum of Art. A true and correct copy of the 2000 Trust instrument is attached as **Exhibit A**.

24.     On June 7, 2001, Mrs. McIntyre amended and restated the 2000 Trust (the "2001 Amendment"). In the 2001 Trust, upon Mrs. McIntyre's death, Mr. McIntyre would become the life beneficiary. Upon Mr. McIntyre's death, or if he does not survive Mrs. McIntyre, the entire residuary is split, with one-half left to a nephew, and the other one-half left to Notre Dame's Snite Museum of Art. A true and correct copy of the 2001 Trust instrument is attached as **Exhibit B**.

25.     From as early as 2004, when Mrs. McIntyre was 74 years old, she self-reported concerns about her mental decline and memory issues.

26.     On April 12, 2005, Mrs. McIntyre signed a Second Amendment and Restatement of the 2000 Trust (the "2005 Amendment"). In the 2005 Amendment, Mrs. McIntyre left her residuary trust to her husband, Richard McIntyre. On the death of Richard McIntyre, or if he fails to survive her, Mrs. McIntyre bequeathed her entire residuary trust to Notre Dame, to be used for the Snite Museum of Art. A true and correct copy of the 2005 Trust instrument is

5

attached as **Exhibit C**.

27.   In and about 2007, Mrs. McIntyre self-reported to her medical providers that she was having significant issues with her memory.

28.   In and about 2007, Mrs. McIntyre self-reported to her physicians that she was experiencing significant sleeping issues and chronic back pain.

29.   Upon information and belief, throughout various medical appointments with her physicians in 2007 and 2008, Mrs. McIntyre repeatedly self-reported concerns with her inability to recall physician appointments and significant family events and began to seek further medical care for her neurological condition.

30.   In 2009, Mr. and Mrs. McIntyre moved to Ft. Myers, Florida.

31.   Shortly after their move in 2009, Mr. and Mrs. McIntyre began attending St. Isabel's Church in Sanibel, Florida for Catholic Mass.  At the time, Fr. Senk was the pastor of St. Isabel's Church.

32.   As a former nun, Mrs. McIntyre had great respect, faith, and confidence in the Catholic Church and, in particular, her priest.

33.   Mrs. McIntyre's relationship with Fr. Senk was one of immediate confidence and trust.

34.   As a vulnerable elderly woman in a relationship of confidence and trust with Fr. Senk, Mrs. McIntyre was wholly susceptible to Fr. Senk's influence, and eagerly complied with any of his requests.

35.   Shortly after her move to Ft. Myers, Mrs. McIntyre began spending large amounts of time with Fr. Senk and his housemate, Stuart Flaherty, to the exclusion of her own husband.

36.   Mrs. McIntyre's behavior after meeting Fr. Senk was highly inconsistent with her

6

prior behavior.

37.     Mrs. McIntyre discontinued taking annual trips to Canada with her husband, instead taking regular vacations with Fr. Senk and Stuart Flaherty.

38.     Mrs. McIntyre frequently had meals with Fr. Senk and Stuart Flaherty together in restaurants, which meals were often paid for by Mrs. McIntyre, and at Fr. Senk's and Stuart Flaherty's residence.

39.     Mrs. McIntyre, who previously abstained from any alcohol, began drinking alcohol with Fr. Senk and Stuart Flaherty during these dinner parties and at restaurants.

40.     Although elderly and suffering from dementia, chronic back pain, and a sleeping disorder, Mrs. McIntyre began doing various household and personal errands for Fr. Senk and Stuart Flaherty.  These errands included picking up and paying for groceries and dry cleaning.

41.     Upon information and belief, Fr. Senk frequently accompanied Mrs. McIntyre on shopping trips, which trips were funded by Mrs. McIntyre.

42.     Upon information and belief, in one particular shopping trip with Fr. Senk to Saks Fifth Avenue, Mrs. McIntyre spent close to $5,000 on new clothing and accessories for Fr. Senk.

43.     In and around 2010, after Mrs. McIntyre had experienced significant further cognitive decline, Mr. and Mrs. McIntyre sought treatment for Mrs. McIntyre at a Johns Hopkins facility in Baltimore, Maryland.

44.     Upon information and belief, in and throughout 2010 and 2011, Mrs. McIntyre continued to experience trouble sleeping and continued taking sleeping pills.

45.     For much of her adult life, Mrs. McIntyre suffered from chronic back pain due to reoccurring back issues.  As a result of this condition, she frequently took strong pain medication.

7

46.    Upon information and belief, despite his regular income and stipends from the Diocese of Venice, Fr. Senk represented to Mrs. McIntyre that he needed more money from Mrs. McIntyre.

47.    In early July of 2011, Mrs. McIntyre wrote a check to Fr. Senk for $1,000. The check was not made payable to St. Isabel Church, but to Fr. Senk personally.

48.    On July 21, 2011, Mrs. McIntyre signed a Restatement of Trust, restating and amending the 2005 Trust (the "2011 Amendment"). In the 2011 Trust instrument, Mrs. McIntyre left a $10,000 distribution to Fr. Senk as Pastor of St. Isabel Catholic Church. The Trustee and Personal Representative believes that this is a bequest to St. Isabel Catholic Church and not to Fr. Senk in his individual capacity. Fr. Senk is no longer the Pastor of the Church. In that Instrument, Mrs. McIntyre bequeathed her residuary trust assets to her husband, Richard McIntyre. On the death of Richard McIntyre, or if he fails to survive her, Mrs. McIntyre bequeathed her entire residuary trust to Notre Dame, to be used to erect and maintain a sculpture in front of the art museum. A true and correct copy of the 2011 Trust is attached as **Exhibit D**.

49.    Fr. Senk took advantage of Mrs. McIntyre's deteriorating mental and physical condition and her utmost trust and confidence in him, and unduly influenced her to leave him a $10,000 distribution in her 2011 Trust.

50.    Based upon Fr. Senk's continued representations to Mrs. McIntyre that he needed money, Mrs. McIntyre regularly wrote personal checks to Fr. Senk from both her personal funds and her Trust funds.

51.    For example, for just the six-month period between July, 2011 and December, 2011, and in addition to cash payments, restaurants, groceries, dry cleaning expenses, and other gifts, Mrs. McIntyre wrote a minimum of $19,000 in multiple personal checks to Fr. Senk.

8

52.     Upon information and belief, Mrs. McIntyre's husband attempted on numerous occasions to discuss with Mrs. McIntyre her mental confusion and her apparent obsession with Fr. Senk. Mr. McIntyre instructed Fr. Senk directly to limit his time with Mrs. McIntyre and decline to accept any of Mrs. McIntyre's money.

53.     Despite these pleas, Fr. Senk continued to accept the excessive monetary gifts and labor from Mrs. McIntyre for his own personal gain.

54.     In 2012, Mrs. McIntyre continued to be treated for a sleep disorder, depression, and cognitive issues.

55.     Mrs. McIntyre's payments to Fr. Senk continued. For just the six-month period between January, 2012 through July, 2012, Mrs. McIntyre wrote approximately $9,000 worth of personal checks to Fr. Senk.

56.     Upon information and belief, the personal checks to Fr. Senk were in addition to cash payments, groceries, restaurant outings, vacation expenses, and shopping trips, all paid for by Mrs. McIntyre.

57.     Upon information and belief, due to her deteriorated mental status and to her inability to recall dates, conversations, appointments, or her actual volunteer obligations, Mrs. McIntyre was asked to discontinue her volunteer work at Shell Point Retirement Community.

58.     Mrs. McIntyre served as a Eucharistic Minister in the Catholic Church for many years. While serving in this capacity at St. Isabel's Parish, Mrs. McIntyre's memory became so poor that she was unable to recite the required prayers or recall the times and locations at which she was scheduled to distribute the Sacrament of Communion to fellow parishioners who were unable to attend Mass in person at St. Isabel's Church. As a result, she was asked to discontinue her service as a Eucharistic Minister.

9

59. Upon information and belief, Fr. Senk was aware of and involved in the decision to discontinue Mrs. McIntyre's service as a Eucharistic Minister due to her progressing dementia.

60. Nevertheless, Fr. Senk continued to ask for and accept money, services, and gifts from Mrs. McIntyre.

61. Upon information and belief, Fr. Senk, and his companion, Stuart Flaherty, represented to Mrs. McIntyre that Fr. Senk's health insurance through the church did not cover his medical needs.

62. For all relevant time periods, upon information and belief, the Diocese of Venice fully covered all of Fr. Senk's medical needs and prescriptions.

63. As a result, Mrs. McIntyre, easily confused, lacking any working memory, and having the utmost trust and faith in Fr. Senk, continued to write personal checks to Fr. Senk and to pay for many of his living expenses.

64. On July 9, 2012, Mrs. McIntyre signed a First Amendment to Restatement of Trust, amending the 2011 Trust (the "First 2012 Amendment"). In the First 2012 Amendment, Mrs. McIntyre directed the Trustee to pay to "my friend," Fr. Senk, the Trust income for life, as well as discretionary distributions from principal as the Trustee deems necessary for Fr. Senk's health, support, and maintenance. Upon Fr. Senk's death, the Trust balance, if any, was to be distributed to Notre Dame for the erection and maintenance of a sculpture in front of the art museum. A true and correct copy of the First 2012 Trust Amendment is attached as **Exhibit E.**

65. The First 2012 Trust Amendment removed Mrs. McIntyre's own husband as a beneficiary of her Trust and replaces him with Fr. Senk.

66. Fr. Senk took advantage of Mrs. McIntyre's deteriorating mental and physical

10

condition and her utmost trust and confidence in Fr. Senk, and unduly influenced her to execute the First 2012 Amendment, leaving virtually all of the Trust assets to Fr. Senk.

67.     Just over a month later, on August 15, 2012, Mrs. McIntyre signed a First Amendment to Marion Knott McIntyre Restatement of Trust, restating the 2011 Trust (the "Second 2012 Trust Amendment"). The Second 2012 Trust Amendment contained language almost identical to the First 2012 Trust Amendment, except that the words "my friend" describing Fr. Senk were removed. Specifically, the Trustee is directed to pay to Fr. Senk the Trust income for life, as well as any discretionary distributions from principal as the Trustee deems necessary for Fr. Senk's health, support, and maintenance. Upon Fr. Senk's death, the Trust balance, if any, is to be distributed to Notre Dame for the erection and maintenance of a sculpture in front of the art museum. A true and correct copy of the Second 2012 Trust Amendment is attached as **Exhibit F**.

68.     Fr. Senk took advantage of Mrs. McIntyre's feeble mental and physical condition and her utmost trust and confidence in Fr. Senk and unduly influenced her to leave Fr. Senk the right to receive all of Mrs. McIntyre's Trust assets for his lifetime in the Second 2012 Trust Amendment.

69.     In 2013, Fr. Senk and his companion, Stuart Flaherty, flew repeatedly to Miami, Florida and took trips to Cancun, Mexico; Lake Tahoe, Nevada; and throughout Europe.

70.     Mrs. McIntyre's payments to Fr. Senk continued. In 2013, at a minimum, Mrs. McIntyre wrote at least another $9,000.00 in personal checks to Fr. Senk.

71.     By 2013, many of the personal checks drafted by Mrs. McIntyre to Fr. Senk regularly contained errors, were indecipherable, or were missing information.

72.     Upon information and belief, Mrs. McIntyre's husband continued to ask Fr. Senk

to reduce contact with his wife.

73.     Throughout 2013, Fr. Senk deposited thousands of dollars in cash into his personal bank account.

74.     On January 29, 2014, Mrs. McIntyre's husband died unexpectedly.

75.     At Mr. McIntyre's funeral and in emails to Fr. Senk after the funeral, several family members expressed concern to Fr. Senk about Mrs. McIntyre's completely deteriorated mental status and requested that Fr. Senk not accept any monetary or other gifts from Mrs. McIntyre.

76.     On or about the day of her husband's funeral, Mrs. McIntyre wrote a $2,000 check made payable to Fr. Senk.  Fr. Senk accepted and deposited the check into his personal bank account.

77.     Throughout 2014, Fr. Senk continued to associate with Mrs. McIntyre.

78.     Upon information and belief, into 2014, Fr. Senk and Stuart Flaherty repeatedly visited Mrs. McIntyre at her home after-hours, leaving Mrs. McIntyre's house with boxes of high-dollar works of art, famous statutes, fine crystal, antique furniture, and even Mr. and Mrs. McIntyre's custom wedding rings.

79.     Throughout 2014, Fr. Senk continued to make large deposits of cash – several thousands of dollars – into his personal bank account.

80.     In September 2014, Mrs. McIntyre was found at a local café confused about where she was and why she was there, and unable to recall where she lived.  She was escorted home.

81.     In September 2014, Fr. Senk accompanied Mrs. McIntyre on a trip to Europe.

82.     Upon information and belief, Mrs. McIntyre was so mentally feeble and frail, she

was unable to even pack her own suitcase for her trip to Europe.

83.     Mrs. McIntyre paid for many of Fr. Senk's trip expenses while in Europe.

84.     Into 2014, Mrs. McIntyre continued to pay for regular expenses for Fr. Senk and continued to give Fr. Senk cash and gift cards.

85.     By late 2014, Mrs. McIntyre was unable to accurately fill in a personal check.  As a result, upon information and belief, on several occasions, either Fr. Senk or his companion, Stuart Flaherty, wrote checks to Fr. Senk using Mrs. McIntyre's check forms, then had Mrs. McIntyre sign them.

86.     In January of 2015, Mrs. McIntyre was hospitalized.

87.     During Mrs. McIntyre's hospitalization, and shortly after a visit by Fr. Senk, a ring owned by Mrs. McIntyre, valued in the tens of thousands of dollars, disappeared from her hospital room.

88.     After a police investigation was initiated by family members, the ring was discovered by family members in Mrs. McIntyre's residence.

89.      Fr. Senk was one of the few individuals known to have a key to Mrs. McIntyre's residence.

90.     For her protection, in 2015, Mrs. McIntyre was moved by her family members from her assisted living facility in Shell Point Retirement Community to a heath care facility in Baltimore, Maryland.

91.     Mrs. McIntyre died on December 12, 2017.

92.     Mrs. McIntyre was a widow at the time of her death and had no children or grandchildren.

93.     The Diocese of Venice in Florida Code of Pastoral Conduct prohibits a priest

13

from entering into any legal instrument, such as a trust, with an individual to whom he ministers, from which the priest may directly or indirectly derive a financial benefit.

94.    Fr. Senk received well over $100,000 from Mrs. McIntyre in cash, personal checks, personal property, services, food, and gift cards from approximately 2010 to 2015, all for his own personal benefit.  Furthermore, based on changes made in the First and Second 2012 Trust Instruments, in particular, Fr. Senk personally is the sole lifetime income beneficiary of the Trust, with the right to request distributions from principal as necessary for his health and welfare.

95.    Many of the assets Fr. Senk received were taken directly from the Trust corpus, thereby directly depleting the Trust corpus, which was ultimately intended to benefit Mrs. McIntyre's husband while he was alive and thereafter Notre Dame.

96.    Other assets and personal property Fr. Senk received were part of Mrs. McIntyre's personal assets.

97.    Mrs. McIntyre's Last Will and Testament dated July 21, 2011 is what is commonly known as a "pour over will."  In it, Mrs. McIntyre's entire residuary estate "poured over" to her Trust upon her death.

98.    As a direct result of Fr. Senk's undue influence, the assets ultimately distributed to the Trust from Mrs. McIntyre's estate were significantly depleted.

## COUNT I

(Equitable Claim by Charge Against
Defendant Under Confidential Relationship)

99.    Plaintiff repeats the allegations contained in paragraphs 1 through 98 of this Complaint as if set forth in full in this Count I.

100.    As her trusted priest and confidant, Fr. Senk had a confidential relationship with

14

Mrs. McIntyre.

101.   As her trusted priest and confidant, Fr. Senk had a fiduciary duty to Mrs. McIntyre to not take personal advantage of her position, and he was required to exclude all selfish interest, which duty he breached.

102.   In violation of, and in breach of, his confidential and fiduciary duties, Fr. Senk did cause money, property, and assets to be taken from Mrs. McIntyre for his personal benefit, which would otherwise have passed to Mrs. McIntyre's Estate and then Trust through proper distributions of the probate and non-probate process.

103.   Fr. Senk also failed in his fiduciary and confidential capacity to act for Mrs. McIntyre's wellbeing, both physically and financially, rather than his own, which duty included avoiding all self-dealing or appearance thereof, refraining from misrepresentations or secret diversions of assets.

104.   Due to the improper actions of Fr. Senk, in breach of his confidential and fiduciary duties, the Court should assume equitable jurisdiction over this matter to make appropriate equitable decrees and rulings to correct this impropriety, fraud, and/or undue influence.

105.   Fr. Senk has acted with unclean hands, and should not prosper from his bad faith acts.

106.   Plaintiff has been injured by the actions of Defendant Fr. Senk.

**ACCORDINGLY**, Plaintiff requests that this Court:

A.   Adjudge, decree and declare that Fr. Senk breached his confidential and fiduciary duties in the particulars as set out herein for which he is personally liable and accountable;

B.   Adjudge, decree and declare that the First Amendment to the Marion Knott McIntyre Restatement of Trust dated August 15, 2012 be, and hereby is, void and unenforceable due to the acts of Fr. Senk upon Mrs. McIntyre;

15

C.  Adjudge, decree and declare that any and all provisions concerning Fr. Senk contained in the Marion Knott McIntyre Restatement of Trust dated July 21, 2011, if they are determined to be for his benefit and not for the benefit of St. Isabel Catholic Church be, and hereby are, void and unenforceable due to the acts of Fr. Senk upon Mrs. McIntyre;

D.  Grant an accounting to Plaintiff for the full amount of the damages sustained by Plaintiff for what Plaintiff would be entitled to receive from Mrs. McIntyre's probate and/or non-probate assets;

E.  Grant Plaintiff a judgment against Fr. Senk in such amount as may be shown by such accounting;

F.  Charge upon Fr. Senk a constructive or resulting trust of all property divested from Mrs. McIntyre improperly, which constructive or resulting trust is requested for the benefit of the Estate and the Trust;

G.  Order Fr. Senk to properly convey back to Mrs. McIntyre's Estate or the Trust, as this Court equitably directs, all of his right, title, and interest in assets and property improperly taken;

H.  Surcharge and/or require a disgorgement of improperly obtained assets and property; and

I.  Grant Plaintiff interest, costs, and such other and further relief as the Court may deem to be necessary and proper.

## COUNT II

### (Undue Influence)

107.  Plaintiff repeats the allegations contained in paragraphs 1 through 106 of this Complaint as if set forth in full in this Count II.

108.  From the time that Mrs. McIntyre created the 2000 Trust until 2011, the disposition of the assets of the Trust was consistent with her expressed intention to care for her family and leave a bequest for Notre Dame.

109.  After Mrs. McIntyre began having significant problems with mental decline, memory issues, and other health issues, however, she became highly susceptible to undue influence.

110.    There was a relationship of confidence and trust between Fr. Senk and Mrs. McIntyre.

111.    Beginning in 2009, there was ample time and opportunity for Fr. Senk to unduly influence Mrs. McIntyre.

112.    Fr. Senk did, in fact, exercise dominion, control, and influence over Mrs. McIntyre to such an extent that her own free agency was destroyed.

113.    Fr. Senk caused or assisted in the preparation or execution of the 2011 Trust, the First 2012 Trust Amendment, and the Second 2012 Trust Amendment by Mrs. McIntyre, and the 2012 Trust Amendments to provide a substantial benefit to Fr. Senk that constitutes both a substantial change from prior Trust documents and an unnatural disposition of her assets upon her death.

114.    The First 2012 Trust Amendment and the Second 2012 Trust Amendment, in particular, which both name Fr. Senk as a lifetime beneficiary of the Trust income and principal, were instruments containing directions that were inconsistent with Mrs. McIntyre's repeated and former express desire that her husband, while he was alive, and then Notre Dame benefit fully from Mrs. McIntyre's estate and trust.

115.    The 2011 Trust, the First 2012 Trust Amendment and the Second 2012 Trust Amendment provisions, which benefitted Fr. Senk to the detriment of the Trust and were contrary to Mrs. McIntyre's former express testamentary and trust instruments.

116.    The 2011 Trust, the First 2012 Trust Amendment, and the Second 2012 Trust Amendment provisions substituted Fr. Senk for Mrs. McIntyre's own family member (her husband).

117.    In addition to influencing the execution of the above Trust amendments for the

benefit of Fr. Senk, Fr. Senk unduly influenced Mrs. McIntyre to distribute assets directly from her Trust corpus, while Mrs. McIntyre was still alive, to Fr. Senk.

118.    Mrs. McIntyre was highly susceptible to undue influence at the time it was exerted upon Mrs. McIntyre by Fr. Senk.

119.    As a result of Fr. Senk's undue influence, Plaintiff has suffered damages in excess of Five Hundred Thousand Dollars ($500,000).

120.    Plaintiff has been forced to retain an attorney to prosecute this action, and Plaintiff is entitled to an award of all costs of collection, including attorneys' fees.

**ACCORDINGLY,** Plaintiff requests that this Court:

A.    As necessary, adjudge, decree and declare that Fr. Senk unduly influenced Mrs. McIntyre in the execution of the 2011 Trust, which provided for a distribution of $10,000 to Fr. Senk in his capacity as Pastor of St. Isabel Catholic Church upon Mrs. McIntyre's death;

B.    As necessary, declare and decree that the provisions of the 2011 Trust, if they are determined to be for the benefit of Fr. Senk and not for the benefit of St. Isabel Catholic Church, are hereby void;

C.    As necessary, adjudge, decree and declare that Fr. Senk unduly influenced Mrs. McIntyre in the execution of the First 2012 Trust Amendment, which provided for a lifetime trust benefit to Fr. Senk of income and discretionary distributions upon Mrs. McIntyre's death;

D.    As necessary, declare and decree that the provisions of the First 2012 Trust Amendment benefitting Fr. Senk are hereby void;

E.    Adjudge, decree and declare that Fr. Senk unduly influenced Mrs. McIntyre in the execution of the Second 2012 Trust Amendment, which provided for a lifetime trust benefit to Fr. Senk of income and discretionary distributions upon Mrs. McIntyre's death;

F.    Declare and decree that the provisions of the Second 2012 Trust Amendment benefitting Fr. Senk are hereby void;

G.    Grant an accounting to the Plaintiff for the full amount of the damages sustained by Plaintiff for what Plaintiff would be entitled to receive from Mrs. McIntyre's probate and/or non-probate assets;

18

H.     Grant Plaintiff a judgment against Fr. Senk in such amount as may be
       shown by such accounting;

I.     Order Fr. Senk to properly convey back to Mrs. McIntyre's Estate or
       the Trust, as this Court equitably directs, all of his right, title, and
       interest in assets and property improperly taken;

J.     Surcharge and/or require a disgorgement of improperly obtained
       assets and property; and

K.     Grant Plaintiff interest, costs, and such other and further relief as the
       Court may deem to be necessary and proper.

## COUNT III

### (Tortious Interference with Expectancy)

121.   Plaintiff repeats the allegations contained in paragraphs 1 through 120 of this
Complaint as if set forth in full in this Count III.

122.   Based on the terms of Mrs. McIntyre's Last Will & Testament dated July 21,
2011, there existed an expectancy that the assets of Mrs. McIntyre's entire residuary estate would
"pour over" into the Trust upon her death, and a reasonable certainty that such expectancy would
be realized.

123.   Fr. Senk unduly influenced Mrs. McIntyre and used duress to significantly and
intentionally deplete her personal assets during her lifetime for his sole benefit.

124.   In so doing, Fr. Senk tortuously interfered with the Trust's ability to receive its
full and proper distribution from the Estate.

125.   Plaintiff was economically damaged by Fr. Senk's tortious interference.

**ACCORDINGLY**, Plaintiff requests that this Court:

A.     Adjudge, decree and declare that Fr. Senk tortuously interfered with the
       Trust's expected inheritance;

19

B.    As necessary, declare and decree that the provisions of the 2011 Trust, if they are determined to be for the benefit of Fr. Senk and not for the benefit of St. Isabel Catholic Church, are hereby void;

C.    As necessary, adjudge, decree and declare that Fr. Senk unduly influenced Mrs. McIntyre in the execution of the First 2012 Trust Amendment, which provided for a lifetime trust benefit to Fr. Senk of income and discretionary distributions upon Mrs. McIntyre's death;

D.    As necessary, declare and decree that the provisions of the First 2012 Trust Amendment benefitting Fr. Senk are hereby void;

E.    Grant an accounting to the Plaintiff for the full amount of the damages sustained by Plaintiff for what Plaintiff would be entitled to receive from Mrs. McIntyre's probate and/or non-probate assets;

F.    Grant the Plaintiff a judgment against Fr. Senk in such amount as may be shown by such accounting;

G.    Charge upon Fr. Senk a constructive or resulting trust of all property divested from Mrs. McIntyre improperly, which constructive or resulting trust is requested for the benefit of the Estate and the Trust;

H.    Order Fr. Senk to properly convey back to Mrs. McIntyre's Estate or the Trust, as this Court equitably directs, all of their right, title, and interest in assets and property improperly taken;

I.    Surcharge and/or require a disgorgement of improperly obtained assets and property; and

J.    Grant Plaintiff interest, costs, and such other and further relief as the Court may deem to be necessary and proper.

## COUNT IV

### (Conversion)

126.    Plaintiff repeats the allegations contained in paragraphs 1 through 125 of this Complaint as if set forth in full in this Count IV.

127.    Fr. Senk abused his position as Mrs. McIntyre's trusted priest and confidant, as well as his access to her home, to wrongfully take her personal property without permission or justification, including personal checks, boxes of high-dollar works of art, famous statutes, fine

crystal, antique furniture, and even Mr. and Mrs. McIntyre's custom wedding rings.

128.    Fr. Senk removed the foregoing items of personal property with the intent to convert and otherwise exercise dominion over the chattels.

129.    Fr. Senk removed the items of personal property from Mrs. McIntyre's immediate possession, and these items would have passed with Mrs. McIntyre's entire residuary estate to the Trust upon her death, but for Fr. Senk's wrongful taking.

130.    Upon information and belief, Fr. Senk has harmed and dissipated certain or all of these items of personal property for his sole benefit.

131.    As a result of Fr. Senk's wrongful taking, Plaintiff was economically damaged.

**ACCORDINGLY**, Plaintiff requests that this Court:

A.    Adjudge, decree and declare that Fr. Senk converted Mrs. McIntyre's personal property;

B.    Grant an accounting to the Plaintiff for the full amount of the damages sustained by Plaintiff for what Plaintiff would be entitled to receive from Mrs. McIntyre's probate and/or non-probate assets;

C.    Grant the Plaintiff a judgment against Fr. Senk in such amount as may be shown by such accounting;

D.    Charge upon Fr. Senk a constructive or resulting trust of all personal property property divested from Mrs. McIntyre improperly, which constructive or resulting trust is requested for the benefit of the Estate and the Trust;

E.    Order Fr. Senk to properly convey back to Mrs. McIntyre's Estate or the Trust, as this Court equitably directs, all of their right, title, and interest in assets and personal property improperly taken;

F.    Surcharge and/or require a disgorgement of improperly obtained assets and personal property; and

G.    Grant Plaintiff interest, costs, and such other and further relief as the Court may deem to be necessary and proper.

## COUNT V

### (Unjust Enrichment)

132.    Plaintiff repeats the allegations contained in paragraphs 1 through 131 of this Complaint as if set forth in full in this Count V.

133.    As a result of Fr. Senk's undue influence, breach of confidential and fiduciary relationships, conversion, tortious interference, and other tortious conduct, he obtained from Ms. McIntyre, the Estate, and the Trust benefits, including assets, monies, and property.

134.    Fr. Senk appreciated and accepted these benefits under such circumstances as to make it inequitable for Fr. Senk to retain the benefits without payment of their value or return of the assets, monies, and property.

135.    As a result of Fr. Senk's unjust enrichment, Plaintiff was economically damaged.

**ACCORDINGLY,** Plaintiff requests that this Court:

A.    As necessary, adjudge, decree and declare that Fr. Senk was unjustly enriched in his receipt, acceptance, and retention of benefits from Mrs. McIntyre, the Estate, and the Trust;

B.    Grant an accounting to the Plaintiff for the full amount of the damages sustained Plaintiff for what Plaintiff would be entitled to receive from Mrs. McIntyre's probate and/or non-probate assets;

C.    Grant Plaintiff a judgment of restitution against Fr. Senk in such amount as may be shown by such accounting;

D.    Order Fr. Senk to properly convey back to Mrs. McIntyre's Estate or to the Trust, as this Court equitably directs, all of his right, title, and interest in assets and property improperly taken;

E.    Surcharge and/or require a disgorgement of improperly obtained assets and property; and

F.    Grant Plaintiff interest, costs, and such other and further relief as the Court may deem to be necessary and proper.

James E. Edwards, Jr.
(CPF No. 8212010120)
Kyle S. Kushner
(CPF No. 1512160025)
Baker, Donelson, Bearman, Caldwell &
Berkowitz, P.C.
100 Light Street
Baltimore, Maryland   21202
410-685-1120
jedwards@bakerdonelson.com
kskushner@bakerdonelson.com